**Vincent COPPOLA,**
**Petitioner, Appellant,**

v.

**Ronald L. POWELL, etc., et al.,**
**Respondents, Appellees.**

No. 89–1109.

United States Court of Appeals,
First Circuit.

Heard May 3, 1989.
Decided July 14, 1989.

James E. Duggan, Chief Appellate Defender, Appellate Defender Program, Franklin Pierce Law Center, for petitioner, appellant.

Tina Schneider, Asst. Atty. Gen., Criminal Justice Bureau, with whom John P. Arnold, Atty. Gen., was on brief, for respondents, appellees.

Before BOWNES and BREYER, Circuit Judges, and GRAY,* Senior District Judge.

BOWNES, Circuit Judge.

Petitioner Vincent Coppola was convicted by a jury in New Hampshire Superior Court, Merrimack County, on one count of burglary and two counts of aggravated felonious sexual assault. The New Hampshire Supreme Court affirmed his convictions holding, *inter alia,* that petitioner's prearrest, precustodial statement to the police was not an invocation of his constitutional right to remain silent and was properly received into evidence for use in the prosecution's case in chief. *State v. Coppola,* 130 N.H. 148, 152–53, 536 A.2d 1236, 1239 (1987). Coppola's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 was denied by the United States District Court for the District of New Hampshire. *Coppola v. Powell,* No. C88–373–L (D.N.H. Nov. 30, 1988) (order on motion to dismiss). A certificate of probable cause pursuant to 28 U.S.C. § 2253 was granted and petitioner brings this appeal. We reverse.

## I. FACTS

Shortly after midnight on January 25, 1986, Jessica Hodgins was awakened by a thumping sound at her front door. She got up to investigate the noise and remained standing in her living room near the door. She saw a hand break through a glass window and reach in to unlock and open the door. A man then entered her house and overpowered her, dragging her into the bedroom where he raped her. Approximately one half hour after his arrival the man left and Mrs. Hodgins called the police.

When the state police arrived at her home Mrs. Hodgins gave a detailed description of her assailant. She also remembered seeing a "little dark foreign car" parked on the road across from her house. A local police officer on his way to the crime scene reported that he saw a small burgundy compact car heading away from the area at 12:52 a.m. The officer identified the first three digits of the license plate and saw that the driver had a mustache.

Because this information led the police to consider petitioner a suspect, state and local police officers went to petitioner's residence and questioned him shortly after 2:30 a.m. on the day of the crime.

Three days later, on the evening of January 28th, two state troopers returned to petitioner's home. One of the troopers "asked [petitioner] if he'd be willing to talk to us." Petitioner replied, "Let me tell you something. I'm not one of your country bumpkins. I grew up on the streets of Providence, Rhode Island. And if you think I'm going to confess to you, you're crazy."

Petitioner was arrested six weeks later, charged and tried. He did not testify at his trial; he was found guilty.

## II. PROCEDURAL FACTS

Petitioner's statement that he was not a country bumpkin and that the police were crazy to think he would confess was presented for a ruling on admissibility at an *in camera* hearing during his trial in state court. The statement had been recorded and included, along with other statements made by petitioner, in the state trooper's written report of what was said at petitioner's home on January 28th. The prosecution introduced the statement through the testimony of the trooper who recorded it.

* Of the Central District of California, sitting by designation.

The pertinent *in camera* testimony of the trooper is as follows:

Direct Examination:

Q   Okay.   Tell us what happened.

A   Well, I asked him if he'd be willing to talk to us.   And at this time, he said to me, "Let me tell you something. I'm not one of your country bumpkins. I grew up on the streets of Providence, Rhode Island.   And if you think I'm going to confess to you, you're crazy."

Q   And what tone of voice did he use in communicating that statement to you?

A   It was fairly hostile, and he appeared to be in a bragging tone when he was telling me how he grew up in Providence, Rhode Island.

Q   What happened then?

A   Well, I said to him, "I just want to give you your rights and then talk to you."

And at this time he said that he would not talk to me without a lawyer.

Cross Examination:

Q   So when you went up to his house on the 28th of January, the reason that you went there was to elicit a confession from Vinnie, right?

A   That's [sic] was my ultimate goal, that's correct.

. . . .

Q   And that statement told you he wasn't going to make a statement and confess to you, right?

A   That's what he said.

The trial judge allowed the trooper to testify as to what petitioner said, as well as to his "bragging tone of voice."   The testimony about the request for counsel was excluded by the judge because of its potentially prejudicial effect on the jury.

The admissibility of the trooper's testimony concerning petitioner's statement was one of two evidentiary issues bearing on the question of guilt[1] before the New Hampshire Supreme Court on appeal.   The other issues bore only on the sentence.   In affirming petitioner's conviction, the court gave its interpretation of petitioner's statement.

A more significant flaw, however, infecting each of the defendant's lines of reasoning, is the factual unreality of equating his taunt to the police with an invocation of his constitutional right to remain silent.   If he had couched his refusal in terms of speech versus silence, it might be arguable that he was claiming a constitutional warrant for his action.   But his statement cannot be read as a mere assertion that he, unlike a bumpkin, would not talk; he claimed, rather, that the police were crazy to think that someone of his sophistication would confess. By describing his choice as a refusal to confess, he implied that he had done something to confess about.   It was this implication that took the defendant's retort outside the realm of allusions to the fifth amendment and affirmatively indicated his consciousness of guilt.

*Coppola,* 130 N.H. at 152–53, 536 A.2d at 1239.

The federal district court agreed with the New Hampshire Supreme Court and granted respondent's motion to dismiss the petition for a writ of habeas corpus.

The issue before us is whether the admission of petitioner's statement for use in the prosecution's case in chief placed an unconstitutional burden on the exercise of petitioner's fifth amendment privilege not to incriminate himself.   Because the admissibility of the statement is akin to the question of the admissibility of a confession, it "merits treatment as a legal inquiry requiring plenary federal review."   *Miller v. Fenton,* 474 U.S. 104, 115, 106 S.Ct. 445, 452, 88 L.Ed.2d 405 (1985).

## III.   APPLICABLE FIFTH AMENDMENT PRINCIPLES

We start our analysis by referring to three basic legal principles that have

---

1.   The other issue concerned the admission of the victim's statement to the police under the excited utterance exception to the hearsay rule.

animated the application of the fifth amendment privilege against self-incrimination. The first principle is that invocation of the right must be given a liberal construction.

This guarantee against testimonial compulsion, like other provisions of the Bill of Rights, "was added to the original Constitution in the conviction that too high a price may be paid even for the unhampered enforcement of the criminal law and that, in its attainment, other social objects of a free society should not be sacrificed." *Feldman v. United States*, 322 U.S. 487, 489 [64 S.Ct. 1082, 1083, 88 L.Ed. 1408] (1944). This provision of the Amendment must be accorded liberal construction in favor of the right it was intended to secure. *Counselman v. Hitchcock*, 142 U.S. 547, 562 [12 S.Ct. 195, 197–198, 35 L.Ed. 1110] (1892); *Arndstein v. McCarthy*, 254 U.S. 71, 72–73 [41 S.Ct. 26, 29, 65 L.Ed. 138] (1920).

*Hoffman v. United States*, 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951); *accord, In re Brogna*, 589 F.2d 24, 27 (1st Cir.1978); *In re Kave*, 760 F.2d 343, 354 (1st Cir.1985). "This constitutional protection must not be interpreted in a hostile or niggardly spirit." *Ullmann v. United States*, 350 U.S. 422, 426, 76 S.Ct. 497, 500, 100 L.Ed. 511 (1956). "[E]ven the most feeble attempt to claim a Fifth Amendment privilege must be recognized...." *United States v. Goodwin*, 470 F.2d 893, 902 (5th Cir.1972), *cert. denied*, 411 U.S. 969, 93 S.Ct. 2160, 36 L.Ed.2d 691 (1973).

■ The second principle is that invocation of the privilege against self-incrimination does not turn on a person's choice of words. "It is agreed by all that a claim of the [fifth amendment] privilege [against self-incrimination] does not require any special combination of words." *Quinn v. United States*, 349 U.S. 155, 162, 75 S.Ct. 668, 673, 99 L.Ed. 964 (1955).

[N]o magic language or ritualistic formula is required to assert the [fifth amendment] privilege [against self-incrimination] which is effectively invoked by any language which the court should reasonably be expected to understand as an attempt to claim the privilege.

*State v. Bell*, 112 N.H. 444, 446, 298 A.2d 753, 756 (1972) (Kenison, C.J.) (citing *Quinn*, 349 U.S. at 163, 75 S.Ct. at 673); *see Securities and Exchange Comm. v. Howatt*, 525 F.2d 226, 230 (1st Cir.1975) (citing *Quinn*, 349 U.S. 155, 75 S.Ct. at 668). And in determining whether the privilege has been invoked, the "entire context in which the claimant spoke must be considered." *United States v. Goodwin*, 470 F.2d at 902.

■ The third basic principle is that application of the privilege is not limited to persons in custody or charged with a crime; it may also be asserted by a suspect who is questioned during the investigation of a crime. "The right to remain silent, unlike the right to counsel, attaches before the institution of formal adversary proceedings." *United States ex rel. Savory v. Lane*, 832 F.2d 1011, 1017 (7th Cir.1987). The privilege "can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory...." *Kastigar v. United States*, 406 U.S. 441, 444, 92 S.Ct. 1653, 1656, 32 L.Ed.2d 212 (1972); *cf. Hoffman v. United States*, 341 U.S. at 486–87, 71 S.Ct. at 818–19 (viability of the privilege depends on whether a responsive answer to the question might result in harmful disclosure); *In re Kave*, 760 F.2d at 354 (witness in a master's inquiry may invoke the privilege if there is a "reasonable possibility of prosecution"). With these principles as a starting point, we turn to the New Hampshire Supreme Court opinion.

To begin with, we respectfully disagree with the New Hampshire Supreme Court's observation that

*pre-Miranda* express refusals to confess ... may be admitted without compromising the interests addressed by the fifth amendment, even assuming that the fifth amendment could be held applicable to prearrest silence, *see Jenkins v. Anderson, supra* at 236 n. 2, and at 242, [100 S.Ct. at 2128 n. 2 and at 2131] (Stevens, J., concurring), or to bar evidence of such silence in the State's case in chief.

*Coppola,* 130 N.H. at 153, 536 A.2d at 1239. In *Jenkins v. Anderson,* 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980), the Court held that "the use of prearrest silence to impeach a defendant's credibility does not violate the Constitution." *Id.* at 240–41, 100 S.Ct. at 2130–31. In *Jenkins,* the prearrest silence was just that: Defendant claimed at trial that he had stabbed the victim in self-defense, but he had failed to say anything to anybody about the stabbing or report the victim's death for two weeks. His silence was used to impeach his trial assertion of self-defense. In the case at bar, we are concerned with the use of a statement made by a suspect and used by the prosecutor in his case in chief, not the use of silence to impeach the defendant's credibility.

Our next disagreement with the New Hampshire court is its statement that if petitioner "had couched his refusal in terms of speech versus silence, it might be arguable that he was claiming a constitutional warrant for his action." *Coppola,* 130 N.H. at 152, 536 A.2d at 1239. This runs counter to the liberal interpretation that should be accorded invocation of the privilege and the principle that a claim of the privilege does not depend upon any special combination of words. The cases discussed *infra* make it clear that the protection of the privilege does not depend on a semantic formula.

Our most emphatic difference with the New Hampshire Supreme Court focuses on its statement: "By describing his choice as a refusal to confess, he implied that he had done something to confess about. It was this implication that took the defendant's retort outside the realm of allusions to the fifth amendment and affirmatively indicated his consciousness of guilt." *Coppola,* 130 N.H. at 152–53, 536 A.2d at 1239. This language amounts to a rule of evidence whereby an inference of consciousness of guilt will trump a fifth amendment claim of the privilege. Any refusal to speak, no matter how couched, in the face of police interrogation, raises an inference that the person being questioned probably has something to hide. Under the reasoning of the New Hampshire court any prear-

rest invocation of the privilege, no matter how worded, could be used by the prosecutor in his case in chief because it raises an inference of guilt. Such logic ignores the teaching that the protection of the fifth amendment is not limited to those in custody or charged with a crime. *See* cases *infra.* The words of a former great judge of this circuit, Chief Judge Magruder, bear repeating:

> Our forefathers, when they wrote this provision into the Fifth Amendment of the Constitution, had in mind a lot of history which has been largely forgotten to-day. See VIII Wigmore on Evidence (3d ed. 1940) § 2250 *et seq.;* Morgan, *The Privilege Against Self–Incrimination,* 34 Minn.L.Rev. 1 (1949). They made a judgment and expressed it in our fundamental law, that it were better for an occasional crime to go unpunished than that the prosecution should be free to build up a criminal case, in whole or in part, with the assistance of enforced disclosures by the accused. The privilege against self-incrimination serves as a protection to the innocent as well as to the guilty, and we have been admonished that it should be given a liberal application. *Hoffman v. United States,* 1951, 341 U.S. 479, 486, 71 S.Ct. 814, 95 L.Ed. 1118. If it be thought that the privilege is outmoded in the conditions of this modern age, then the thing to do is to take it out of the Constitution, not to whittle it down by the subtle encroachments of judicial opinion.

*Maffie v. United States,* 209 F.2d 225, 227 (1st Cir.1954). If the implication of guilt takes the refusal to confess "outside the realm of allusions to the fifth amendment," *Coppola,* 130 N.H. at 152–53, 536 A.2d at 1239, we believe that the equally persuasive implication that a constitutional right was being asserted brings it right back in.

We close our critique of the opinion of the New Hampshire Supreme Court by noting that it characterized petitioner's statement as a "taunt to the police," a "defiant remark" betraying petitioner's "sophistication." *Coppola,* 130 N.H. at 150–52, 536

A.2d at 1238–39. We do not quarrel with the court's characterization but wonder what bearing it has on the question whether petitioner effectively invoked his privilege against self-incrimination.

## IV. DID PETITIONER EFFECTIVELY INVOKE THE PRIVILEGE AGAINST SELF–INCRIMINATION

■ The statement by petitioner was made in the context of a precustodial interrogation of a suspect in a criminal investigation. The police had already questioned petitioner at his home on the day of the crime. Three days later, after learning that his friends had been questioned and being told that he was a suspect in the crime, two uniformed state troopers returned to petitioner's home for further questioning. Petitioner appeared to be nervous, pacing back and forth and walking away from the troopers. The trooper who wrote down petitioner's statement acknowledged that he and the other trooper went to Coppola's residence to elicit a confession and that he understood the statement to mean that Coppola did not want to confess.

In response to the state trooper's questions, petitioner stated: "Let me tell you something. I'm not one of your country bumpkins. I grew up on the streets of Providence, Rhode Island and if you think I'm going to confess to you, you're crazy." As we read the statement, Coppola was telling the state police two things: that he was not going to confess; and that he knew he had a right not to incriminate himself. We agree with the New Hampshire court that petitioner was boasting of his sophistication in the ways of criminal interrogations. Coppola, in effect, told the police that he knew they were looking for a confession and that he knew from street experience that he had the right not to say anything that would incriminate him. That the words used were boastful and arrogant does not change their plain meaning.

We think it significant that immediately after making the statement and being told by the trooper that "I just want to give you your rights and then talk to you," petition-er said that he would not talk to the police without a lawyer. This shows that petitioner, presumably on the basis of his "street smarts," knew that he had a right to be represented by counsel at any interrogation.

We find, contrary to the New Hampshire Supreme Court, that petitioner's statement invoked his privilege against self-incrimination. The next issue is its admissibility.

## V. THE ADMISSIBILITY OF PETITIONER'S STATEMENT IN THE PROSECUTOR'S CASE IN CHIEF

■ We think that the issue presented by the admission of petitioner's statement is essentially the same as those addressed in cases defining the boundaries for prosecutorial comment on a defendant's exercise of the fifth amendment privilege against self-incrimination. These decisions control the issue despite several distinguishing facts in the instant case. Although the statement at issue in this case came in through police testimony and not through a comment by the prosecution, it is nonetheless evidence that came before the jury through the efforts and design of the prosecution. And while the trooper's testimony does not relate to a failure to testify or to post-*Miranda* silence, the disclosure of the words petitioner used to claim his privilege results in the same dilemma addressed in the comment cases: how to accommodate a search for the truth without undermining the purpose of the fifth amendment.

The broad rule of law we take from the line of cases beginning with *Raffel v. United States*, 271 U.S. 494, 46 S.Ct. 566, 70 L.Ed. 1054 (1926), is that where a defendant does not testify at trial it is impermissible to refer to any fifth amendment rights that defendant has exercised. *Raffel* involved a second trial. The question was: "Was it error to require the defendant, Raffel, offering himself as a witness upon the second trial, to disclose that he had not testified as a witness in his own behalf upon the first trial." *Id.* at 496, 46 S.Ct. at 567. The Court held that since a defendant takes the stand, "he does so as any other witness, and within the limits of

the appropriate rules he may be cross-examined as to the facts in issue." *Id.* at 497, 46 S.Ct. at 567–68. The Court concluded by stating: "The safeguards against self-incrimination are for the benefit of those who do not wish to become witnesses in their own behalf and not for those who do." *Id.* at 499, 46 S.Ct. at 568.

In *Griffin v. California,* 380 U.S. 609, 615, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106 (1965), it was held that "the Fifth Amendment, in its direct application to the Federal Government, and in its bearing on the States by reason of the Fourteenth Amendment, forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt."

This circuit has been vigilant in enforcing this rule. *See United States v. Elkins,* 774 F.2d 530, 535–40 (1st Cir.1985); *United States v. Skandier,* 758 F.2d 43, 45 (1st Cir.1985); *United States v. Cox,* 752 F.2d 741, 745–46 (1st Cir.1985); *Desmond v. United States,* 345 F.2d 225, 226–27 (1st Cir.1965).

The Court held in *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), that a statement made by defendant to police that was inadmissible in the prosecution's case in chief because of lack of procedural safeguards required under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), could be used on cross-examination to impeach defendant's credibility. In the course of its opinion, the Court stated: "Every criminal defendant is privileged to testify in his own defense, or refuse to do so. But that privilege cannot be construed to include the right to commit perjury." *Id.* 401 U.S. at 225, 91 S.Ct. at 645.

The next case is one which the New Hampshire Supreme Court referred to in its opinion, *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). *Doyle* proscribed the use of defendant's post-*Miranda* silence to impeach on cross-examination his exculpatory story told for the first time at trial. The Court concluded that "use of the defendant's post-arrest silence in this manner violates due process...."

*Id.* at 611, 96 S.Ct. at 2241. *Doyle,* strictly speaking, does not directly involve the fifth amendment privilege against self-incrimination. We include it because it has some bearing on the issue before us and because of the New Hampshire court's reference to it, and its partial quote from the sentence: "Thus, every post-arrest silence is *insolubly ambiguous* because of what the State is required to advise the person arrested." *Id.* at 617, 96 S.Ct. at 2244 (emphasis added).

We have already discussed *Jenkins v. Anderson,* 447 U.S. 231, 100 S.Ct. 2124, and only repeat the holding: "We hold that *impeachment* by use of prearrest silence does not violate the Fourteenth Amendment." *Id.* at 240, 100 S.Ct. at 2126 (emphasis added). Even if the word "silence" is construed to mean a spoken invocation of the privilege against self-incrimination, which was not at all involved in the case, *Jenkins* speaks only to the use of prearrest silence for impeachment.

We have found no cases by the United States Supreme Court holding or suggesting that a prearrest statement by a suspect during police interrogation that he is not going to confess can be used by the prosecutor in his case in chief. The New Hampshire Supreme Court has cited no cases standing for the proposition that prearrest silence or an invocation of the privilege can be used by the prosecutor in his case in chief.

In the case at bar, petitioner stated that he was not going to confess. He followed this with a statement that he would not answer any questions without a lawyer present. He did not later take the stand and offer an exculpatory story which his statement would impeach. Petitioner relied on the protection guaranteed by the fifth amendment from the first police interrogation through trial. Petitioner's constitutional rights were violated by the use of his statement in the prosecutor's case in chief. The next and final issue is whether the use of the statement was harmless error.

## HARMLESS ERROR

Our harmless error analysis is made in accord with the teachings of the Court: "Since *Chapman,* [*Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)] the Court has consistently made clear that it is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations, see, *e.g., Brown, supra,* [411 U.S. 223] at 230–232, [93 S.Ct. 1565, 1569–1570, 36 L.Ed.2d 208 (1973)]; *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); *Milton v. Wainwright,* 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972)." *United States v. Hasting,* 461 U.S. 499, 509, 103 S.Ct. 1974, 1980, 76 L.Ed. 2d 96 (1983).

We summarize the evidence. The victim was unable to make a courtroom identification of petitioner "because it was too dark, and I didn't have any glasses on." She gave the following description of her assailant: he was a lean man about five foot five in height; he was not Anglo–Saxon, "maybe Puerto Rican or French or something"; his hair was thick, dark and curly; he had about a day's growth of beard on his face; "I believe he had a mustache"; he had hair on his chest; his hands "felt unclean"; he was wearing a poplin-type jacket and as he left it sounded as if he had on heavy leather boots; there was a smell of cigarettes and alcohol on his breath.

A friend of petitioner's and a police officer who spoke with petitioner the night of the crime testified that this description fit petitioner.

The police officer also noticed what appeared to be a new Band–Aid on petitioner's left index finger. When asked about it, petitioner said that he had cut his hand earlier working on his car. The officer also observed that petitioner's hands were clean "but with a grease residue."

The victim testified that she saw a small dark-colored car parked across the street from her house. It was a moonlit night. Petitioner left Manchester at about 11:15 p.m. to drive home to Barnstead. The crime took place in Epsom, New Hampshire, which is between Manchester and Barnstead. He was driving his burgundy Saab which he had worked on earlier that day. At 12:52 a.m. a police officer on his way to the scene of the crime saw a small burgundy car heading north on Route 28. The officer noticed that the driver had a mustache. He also noticed that the first three digits of the license plate was 300. The license plate number on petitioner's Saab was 300342. When the police went to petitioner's house in Barnstead at about 2:30 a.m., the hood of the Saab was still warm.

According to the victim, she had gone to bed about 11:20 p.m. She was wakened by a thump on the front door at 12:14 a.m. Her assailant entered the house, dragged her into the bedroom, tore her clothes off, took his clothes partially off and raped her. She estimated that the assailant was in the house 30 to 40 minutes.

An expert in serology, Kevin B. McMahon, testified that 32% of the adult population of the country, male and female, can be classified as "A Secretors." This means that their body fluid secretions fall into this category. Body fluid secretions are found, *inter alia,* in semen and blood. An examination of the semen taken from the vagina of the victim showed that it was from an "A Secretor." An examination of a blood sample taken from petitioner showed that he was an "A Secretor."

Three jail inmates who met petitioner during his pretrial detention testified for the state. Donald McConnell testified that petitioner told "me that the night that it happened he kicked down a door and he went in and he grabbed the lady and he threw her down. And he was armed with a M–16 rifle." He further testified: "Well I asked him at one point if he was, in fact, admitting committing the rape of the victim. He never told me that he did. The only thing that he did mention was 'What did I have to lose?' And that was the extent of it." The state says in its brief at page 21 that "McConnell received no favorable treatment or promises from the state as a result of his testimony." (Tr. p. 550). We have read the transcript carefully, and

there is no evidence to support this statement at page 550 or 551. On page 542, McConnell testified that his attorney had worked out a plea bargain on the charge facing him (escape from jail) and that there would be a hearing on the plea bargain on November 10, which was subsequent to his testimony at petitioner's trial. On page 546 of the transcript, McConnell testified that no promises were made to him by the prosecutor for testifying.

Inmate James Torrence testified: "Well, he said he broke the window with his hand, cut his hand (inaudible), grabbed the lady by the blouse and ripped it open and her tits fell out." Torrence was asked if he was getting anything in return for testifying and he answered "No."

On direct examination, inmate William Clapper testified as follows:

Q What did he tell you he was charged with?

A Rape.

Q And did he tell you about the facts of the charge?

A Yes.

Q What did he say?

A He told me that a guy owed him some money. And he went to pick it up (inaudible).

Q He said that was the facts of the charge pending against him?

A He said that's what he did.

. . . .

Q And did he tell you what time of day it happened?

A It happened about 1:00 o'clock at night.

Q And what else did he tell you about it?

A That his car—that a maroon subcompact car was seen across the road and that he has one. And he was seen a little while later on the Webster Road a little while after it happened, that—by a Pittsfield police officer.

. . . .

Q Did he talk about his shoes?

A One time we had been talking about boots they took from him for evidence (inaudible). He said he had a pair of them just like them, took them to work with him, put them in the car, and (inaudible).

On cross-examination Clapper testified in greater detail as to what petitioner told him: Petitioner was "running" cocaine to some people in Epsom (the scene of the crime) who were "fronting" it for him. Clapper explained that this means that petitioner was delivering cocaine to retailers and the retailers did not pay for it until after they sold it. The victim was one of those "fronting" cocaine for the petitioner and she owed him seventy thousand dollars. Petitioner went to her house on the night in question armed with an M-16 rifle. The victim's boyfriend was there. Petitioner went after the boyfriend for the money and in the process pushed or threw the victim out of the way. Clapper was emphatic that he did not tell the state trooper who questioned him at the jail that petitioner had said he had raped the woman; petitioner told Clapper only that he had pushed or threw her aside in an effort to get at her boyfriend.

It must be explained here that Clapper had made a statement to one of the jail officials that was tape recorded. Although the record does not state so explicitly, it is clear that defense counsel had been given a copy of the statement. It can be fairly concluded that Clapper's cross-examination testimony tracked his recorded statement.

At the time Clapper gave his statement to the jail official he had decided to plead guilty to seven burglary charges. His attorney had negotiated a plea bargain, or was in the process of trying to negotiate one, under which the state would recommend a two-year sentence to be served in the house of correction. Clapper testified that this meant he would be incarcerated for 16 months. At the time Clapper testified, the plea agreement had not been approved by the court. Clapper further testified that the prosecutor had told him that he would not be getting any reward for testifying. When asked by the prosecutor

why he was testifying, Clapper replied: "Because I want to be a good citizen."

The defense adduced testimony by a Richard Horan who is in the business of repairing, selling and servicing foreign cars that at the time of the crime petitioner's car was leaking about a quart of transmission fluid a day. There was testimony by Sergeant Sparks of the State Police that he had examined the area where petitioner's car had been allegedly parked during the crime and found nothing unusual. Sparks made the examination shortly after he had arrived at the victim's house in response to her telephone call reporting the crime.

An analysis of the hair found at the scene showed that it all came from the victim. No fingerprint evidence was introduced.

Petitioner was not arrested until six weeks after the crime. His arrest was prompted by a telephone call from the victim to a state trooper stating "he's come back." The trooper immediately went to the victim's house. He found footprints in the snow. The footprints led to the front door, then to a spare bedroom window, back to the front of the house and then to a window in the living room area. The trooper estimated the shoe size of the person making the prints to be eight and a half, the trooper's own shoe size. Petitioner wears size eight shoes.

Although the harmless error question is close, we cannot conclude that the admission of petitioner's statement was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824. Our review of the record, leaving aside the statement, does not make it clear beyond a reasonable doubt that the jury would have returned a verdict of guilty. *United States v. Hasting*, 461 U.S. at 510–11, 103 S.Ct. at 1981. This is certainly not a case of "overwhelming evidence of guilt." *Milton v. Wainwright*, 407 U.S. at 377, 92 S.Ct. at 2177–78. The testimony of the three jail inmates raises serious questions of credibility. There are gaps in the identification evidence, not large, to be sure, but large enough to raise a reasonable doubt.

There is no conclusive evidence that ties petitioner tightly to the crime. Based upon the evidence without the statement, it is probable that petitioner committed the crime. But that is not the test. We do not know what role petitioner's statement played in the jury's deliberations. The statement may have been the clincher; it was, therefore, not harmless.

The decision of the district court is reversed. The writ shall issue unless the State of New Hampshire, within sixty days, shall take the necessary steps to retry petitioner.