**Sidney A. CLARK, Petitioner, Appellant,**

v.

**John MORAN, etc., Respondent, Appellee.**

No. 91–1128.

United States Court of Appeals, First Circuit.

Heard June 5, 1991.

Decided Aug. 9, 1991.

Matthew F. Medeiros with whom Flanders & Medeiros, Inc., Patricia A.S. Zesk and Edwards & Angell, Providence, R.I., were on brief for appellant.

Jeffrey J. Greer, Asst. Atty. Gen., with whom James E. O'Neil, Atty. Gen., Providence, R.I., was on brief for appellee.

Before BREYER, Chief Judge, BOWNES, Senior Circuit Judge, and CAFFREY,* Senior Judge.

* Of the District of Massachusetts, sitting by desig-

BOWNES, Senior Circuit Judge.

Petitioner Sidney Clark was convicted in 1976 by a jury in Rhode Island Superior Court of second-degree murder for the 1974 stabbing death of Claude Saunders. He is currently serving a life sentence at the Adult Correctional Institute ("ACI") in Rhode Island and, having exhausted his state remedies, has sought habeas corpus relief pursuant to 28 U.S.C. § 2254. His habeas petition was denied by the United States District Court for the District of Rhode Island. 749 F.Supp. 1186. We affirm.

## I. BACKGROUND

Claude Saunders, an ACI inmate, was stabbed to death in his cell around 5 p.m. on November 2, 1974. Saunders was housed in cell #30 on the uppermost of three tiers (the "A Tier") of the Admission and Orientation Section ("A & O").

Sidney Clark was targeted as a suspect after another inmate, Robert Studman, came forward later that night, claiming to be a witness to the murder. Studman informed state police detectives that he had watched from the doorway of the cell while Clark stabbed Saunders. Charles Saunders, the victim's brother and another ACI inmate, also told the state police that Clark had acted threateningly toward his brother earlier in the day.

Having probable cause, the state police searched Clark's cell at around midnight on November 2 and found a shoe with a bloodstain on it and also a bloodstained shirt in Clark's laundry bag. Clark was then brought to the Committing Room at ACI where a benzidine test was performed on him by State Police Lieutenants Egbert Hawes and Richard Quinn at 12:30 a.m. on November 3.

Benzidine is a chemical solution which, when mixed with sodium perborate and acetic acid, will oxidize in the presence of blood. Where blood is present, application of the solution will produce an almost instantaneous deep blue or deep blue-green nation.

color. Although benzidine tests are primarily performed on objects such as weapons, the tests were, at that time, being performed on persons as well, with the solution being applied directly to various parts of the body. When benzidine was applied to Clark, large "positive" (instantaneous deep blue) reactions appeared on his left hand and arm, and blue spotting occurred on his right hand and stomach. These test results were introduced at trial.

Benzidine is a carcinogen; people who have direct bodily contact with benzidine or inhale its fumes have a significantly greater risk of developing bladder cancer. This fact was not generally known either at the time that Clark's test was administered or at his ensuing trial. It was established in a subsequent civil proceeding, however, that the state police officers who administered the test, as well as Dr. DeFanti, the Director of the Rhode Island State Crime Lab, who trained the officers and provided them with the chemicals, were aware of the possible connection between benzidine and cancer in November 1974. *See Clark v. Taylor*, 710 F.2d 4 (1st Cir.1983). On the basis of these findings, the state concedes that Clark's constitutional rights were violated.

Clark advances two arguments in his petition for habeas relief. First, he claims that the benzidine test conducted on him violated his fourteenth amendment rights, and that the introduction of this evidence at trial constituted reversible error. Because the state concedes that Clark's due process rights were violated by the use of the test, the only question before us is whether the introduction of the test results at trial was harmless error beyond a reasonable doubt. Clark also raises a sixth amendment claim, alleging that his trial attorneys' failure to challenge the constitutionality of the benzidine test constituted ineffective assistance of counsel.

In rejecting Clark's habeas petition, the district court agreed with the state court that the introduction of the benzidine test results constituted harmless error in view of the overwhelming evidence of Clark's guilt. The district court also found, given the paucity of knowledge regarding the carcinogenic effects of benzidine at the 1976 trial and the absence of any legal precedent for a constitutional challenge upon this ground, that the performance of Clark's trial counsel fell within the "bounds of reasonableness," as established in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The district court further determined that the introduction of such evidence did not "prejudice his defense." For the reasons discussed below, we affirm this judgment.

## II. HARMLESS ERROR ANALYSIS

■ In *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1966), the Supreme Court held that when evidence has been introduced in violation of a defendant's constitutional rights, a conviction cannot stand unless the effect of this evidence is "harmless beyond a reasonable doubt." *Id.* at 24, 87 S.Ct. at 828. The Supreme Court also stated, however, that "there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless." *Id.* at 23, 87 S.Ct. at 827–28. Constitutional violations in these instances require automatic reversal. Given the clear objective of the harmless error doctrine—to preserve the integrity of the trial process while conserving judicial resources—automatic reversals should be utilized sparingly. *See, e.g., United States v. Hasting*, 461 U.S. 499, 509, 103 S.Ct. 1974, 1980, 76 L.Ed.2d 96 (1983).

In *Chapman*, the Supreme Court gave three examples of infractions that could require automatic reversal: the use of a coerced confession at trial, the partiality of the trial judge and the denial of defendant's right to counsel. 386 U.S. at 23 n. 8, 87 S.Ct. at 828 n. 8. Later, in *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), the Supreme Court suggested that conduct of law enforcement agents which was so outrageous as to "shock the conscience" might "absolutely bar the government from invoking the judicial processes to obtain a conviction." *Id.* at 431–32, 93 S.Ct. at 1643 (cit-

ing *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952)). After an extensive discussion of the factors involved, the district court determined that the constitutional violation in this case did not require an automatic reversal. We agree.

In a recent case, *Arizona v. Fulminante,* ── U.S. ──, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), the Supreme Court retreated from its holding in *Chapman* and determined that the admission of a coerced confession at trial should be analyzed under the harmless error doctrine. The majority differentiated between mere "error[s] in the trial process" and "structural defects in the ... trial mechanism" which affect the "entire conduct of the trial from beginning to end," holding that only the latter require automatic reversal. *Id.* 111 S.Ct. at 1265. The court stated that "[t]he admission of an involuntary confession is a 'trial error' similar in both degree and kind to the erroneous admission of other types of evidence." *Id.* Along this vein, admission of the benzidine test results must also be considered a trial error, rather than a structural defect, and the harmless error doctrine should be applied.

In the practical application of this standard, courts have found error to be harmless when the untainted evidence, standing alone, provided "overwhelming evidence" of the defendant's guilt. *See, e.g., Harrington v. California,* 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969); *United States v. Garcia,* 905 F.2d 557, 560 (1st Cir.), *cert. denied,* ── U.S. ──, 111 S.Ct. 522, 112 L.Ed.2d 533 (1990); *United States v. Dyke,* 901 F.2d 285, 287 (2d Cir.), *cert. denied,* ── U.S. ──, 111 S.Ct. 279, 112 L.Ed.2d 233 (1990); *United States v. Burton,* 871 F.2d 1566, 1574 n. 3 (11th Cir.1989); *United States v. Moran,* 759 F.2d 777, 786 (9th Cir.1985), *cert. denied,* 474 U.S. 1102, 106 S.Ct. 885, 88 L.Ed.2d 920 (1986); *United States v. Posey,* 663 F.2d 37, 42 (7th Cir.1981), *cert. denied,* 455 U.S. 959, 102 S.Ct. 1473, 71 L.Ed.2d 679 (1982). In other words, there must be "no reasonable doubt" that the jury would have reached the same verdict without having received the tainted evidence. *Milton v. Wainwright,* 407 U.S. 371, 377, 92 S.Ct. 2174, 2177, 33 L.Ed.2d 1 (1972).

In reaching this determination, "it is the duty of the reviewing court to consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations." *United States v. Hasting,* 461 U.S. at 509, 103 S.Ct. at 1980. The court must consider the evidence as a whole, weighing the effect of the tainted evidence against the effect of that evidence which was properly admitted. *Lacy v. Gardino,* 791 F.2d 980, 986 (1st Cir.), *cert. denied,* 479 U.S. 888, 107 S.Ct. 284, 93 L.Ed.2d 259 (1986). In reviewing the evidence, we must give due deference to the factual findings of the state court. 28 U.S.C. § 2254(d); *see also Marshall v. Lonberger,* 459 U.S. 422, 432, 103 S.Ct. 843, 849, 74 L.Ed.2d 646 (1983); *Tavares v. Holbrook,* 779 F.2d 1, 3 (1st Cir.1985).

In this case, the effect of the benzidine test results must be weighed against the effect of the untainted evidence to determine whether the improper admission was harmless beyond a reasonable doubt, i.e., whether the properly admitted evidence presented such overwhelming evidence of guilt that we can conclude, beyond a reasonable doubt, that the jury would have returned a verdict of guilty without having received the tainted evidence.

*A. Testimony*

The primary witness in this case was ACI inmate Robert Studman. Studman was housed in cell # 26 on A Tier in the A & O section, just four cells away from Saunders. He testified that around 5 p.m., just as the cells on the tier were being opened for evening exercise, he saw Sidney Clark walk by. As Clark walked by, he pulled a "shank" (homemade knife) out of his pants and held it down by his side. Studman described the shank as being about ten to twelve inches long with a six- to seven-inch nickel-colored blade. The handle of the shank was wrapped in black tape.

Studman testified that after Clark had walked by, he looked out and saw Clark outside cell # 30, Saunders' cell, peering in; Clark then entered the cell. Studman walked toward Saunders' cell and was confronted at the doorway by inmate Tyrone Powell. Powell took an ice pick out of the front of his pants and said, "You can't go in there." Another inmate, Jesse Cannon, was standing farther down the tier in the vicinity of cell # 24. Studman testified that Powell, who lived in cell # 24 of A Tier, had apparently been let out of his cell about five minutes earlier than the other inmates on the tier; Studman heard Powell's cell door "pop" as it was being opened.

Studman remained standing a few feet in front of the cell door, where he was able to see what was going on inside the cell. He observed Clark standing over Saunders, who was sitting on the edge of his bed rolling some marijuana. Studman could tell that they were arguing although he could not understand much of what was being said. The last thing he heard was a swear word uttered by Clark, and then Clark "unleashed with a roundhouse," bringing the shank up with his right hand from behind his back and striking at Saunders. Clark was blocking Studman's view, so he could not see if Saunders had been hit. He did, however, see Saunders rock backwards, hit the wall and then start to jump up, at which point Clark struck him from above. This time Studman could see that Saunders had been hit in the middle of the chest. Saunders then dropped to his knees, grabbed his television set and attempted to throw it at Clark. As this was happening, Clark was backing away and swung again at Saunders from farther back but missed. Clark ran out of the cell as Saunders continued to throw things at him and ran down the tier toward the stairs by cell # 1, sticking the shank in the front of his pants as he went. Powell ran after him.

Saunders came out of the cell a moment later and fell up against the rail. He looked around with a dazed expression and then started running toward the stairs. At this point the walkway was crowded because most of the thirty or so inmates who lived on the tier had come out of their cells for five o'clock exercise.

Around 9:00 that night Studman learned from a neighbor that Saunders had died. He decided to tell the state police what he knew. At the time of the trial, Studman had pending a motion for reduction of an eight-year sentence for robbery. He testified that he had neither negotiated for nor been promised anything regarding this motion in exchange for his testimony. His stated reason for testifying was that Saunders had been a good friend.

Studman's description of how the blows were struck roughly comported with the coroner's observations. Dr. William Sturner performed the autopsy and testified at trial. He stated that Saunders had suffered two stab wounds. The first, and fatal, wound was on the right side of the chest above the nipple. The path of the wound was slightly downward and traveled from the victim's right to left. This wound penetrated the lung and was from five-and-a-half to six inches in depth. The second wound was a superficial one. It was slightly lower, below the nipple and nearer the armpit.

Charles Saunders, the victim's brother, testified as follows: He had been eating supper in the cafeteria with his brother, Claude, around 3:30 p.m. on November 2. Clark approached Claude and accused him of failing to pay a debt of one ounce of marijuana. Claude denied owing him anything, and Clark left the cafeteria. Between 4:30 and 5:00 that afternoon Clark came to Charles' cell and repeated that his brother owed him an ounce of marijuana. Clark then pulled out a knife and started waving it and said that he was going to "scare" Claude. Charles said, "Man, you're not going to do nothing to my brother," to which Clark responded, "Well, if you want to do anything, you're going to get the tip of this knife, too," and then left. Charles described the knife as having a five- or six-inch blade with black tape around the handle.

Julio Holley was an ACI inmate who lived in A & O on the second tier (the "B

Tier"). He testified that on November 2 the cells on his tier were opened a few moments before those on A Tier, where Saunders and Studman lived. When his cell opened around 5:00, he immediately went down to the bottom tier (known as "the Flats"). He testified that he was standing around the middle of the tier with his back to the wall opposite the cells when he glanced up at A Tier and saw Sidney Clark walking toward the upper end of the tier. He also saw Jesse Cannon to his right on A Tier, looking back and forth between the lower end of the tier, where an officer was stationed, and the upper end of the tier, where Clark was headed. This was just before the cells on A Tier were opened. Holley testified that he could see a shank in Clark's right hand because Clark was swinging it and it caught the light. He described the shank as being between ten and twelve inches in length. When Clark got to Saunders' cell, he peered in the doorway.

A few moments after the A Tier cells had been opened, Holley testified that he heard yelling and looked up to see Clark coming out of Saunders' cell. He saw Clark stick the shank into the front of his pants and then rush, along with Cannon, toward the stairs by cell #1. Although Holley testified that he did not notice either Studman or Powell on A Tier during this span of time, he did state that there were several black inmates standing by the doorway of Saunders' cell, but that their backs were to him so that he could not tell who they were. Studman and Powell are both black.

Holley further testified that he then went through a doorway into the "South State" wing. While speaking with another inmate, he saw Cannon and Clark come into the area. They walked by him toward an adjoining section of the prison and Holley noticed that Cannon had a pair of dungarees folded under his arm. They were gone only a few minutes when they walked by him again. Clark had a white towel tucked under his arm, and he and Cannon were whispering. A few moments later Holley saw Cannon and Clark at the Jaycee concession stand. Now Cannon was holding the towel.

Holley testified that he had been promised a transfer to another prison in return for his testimony. He also stated that he agreed to plead guilty to an escape charge because he was told that he could not be transferred while the charge was pending. He was sentenced to only thirty days for the escape.

A shank matching the description of the murder weapon was eventually found on a tip from another inmate, Vincent Pope. Pope testified that around 5:30 p.m. on November 2 he was on the bottom floor of the Awaiting Trial Section speaking to Charles Saunders and some other inmates when there was a directive over the intercom telling all inmates to return to their cells. Pope returned to the front of his cell, which was on the middle tier (the "E Tier"). As he was standing there, he heard running and went to investigate it. He climbed the stairs to the third tier, at which point he could see through a large screen into the middle section of the prison, Tiers G, H and I. Looking across, he saw Cannon and Clark running and saw Cannon leaping toward the ceiling. He then heard the sound of metal against metal. When Cannon and Clark seemed to be looking in his direction, he ducked down and returned downstairs.

Pope contacted his attorney that night and told him what he had seen. The attorney informed him that if he failed to come forward with the information, he could be charged with compounding a felony. Pope eventually spoke with the state police. The police agreed that in return for his testimony he would be released on a rape charge on which he was currently being held without bail.

Trial testimony from several corrections officers who were in the area at the time of the murder neither added nor detracted significantly from the scenario related by the inmates. One officer, David Nerney, testified that at around 4:45 p.m. on November 2, he was at the A & O desk when he had to go up to open Powell's cell. It was customary for inmate kitchen workers

to bring back extra food for the other inmates, and Powell was receiving some ice. Although normally Powell's cell would then have been closed until the general opening at 5:00, Powell refused to close his door, saying that he wanted another bucket of ice. Powell then left his cell, went downstairs and passed into the South State area. At some time between 4:45 and 5:00, Nerney saw Clark walk past his desk into the A & O section and walk up to B Tier. When Nerney walked up to B Tier to open the cells around 5:00, Clark was on B Tier down between cells # 23 and # 26. At trial, Nerney could not recall whether or not he saw Clark on A Tier at all that night although in his original report he stated that he had.

Nerney estimated that it took about four minutes to operate the mechanism to open the cells. During that time he would have been standing at the lower end of B Tier with his back to the stairs. He does not remember either hearing or seeing anyone go up the stairs to A Tier. A little past 5:00 Nerney noticed some unusually loud yelling coming from the far end of A Tier. He closed the control box and went down the stairs to the Flats to try to see what was going on. Looking up, he saw Saunders leaning over the rail and yelling for help. This was approximately thirty seconds after he had first heard the commotion. When he realized Saunders was injured, he ran up and intercepted him around cell # 5 on A Tier. Nerney, along with some other officers, then brought Saunders to the prison hospital.

Nerney testified that he did not remember seeing Studman, Clark, Powell or Cannon near Saunders when he reached him on A Tier. Nor did he remember seeing any of them when he looked up from the Flats. He admitted, however, that there were inmates standing along A Tier and moving up and down the stairs, but he had immediately focused on Saunders and could not identify any of the other people.

Corrections officer Roger Paquette was assigned to open the cells on A Tier that night. Having gone to supper at 4:20 and returned around 4:55, he did not remember seeing Clark on A Tier at all. He testified that he had to wait for Nerney to open the control box on B Tier so that he could get the keys and that therefore A Tier was opened about 1½ minutes after B Tier. Paquette did not recall seeing anyone on A Tier as he unlocked his control box, but he testified that it was dark on the tier, and that, when the state police later asked him to check, he found that most of the light bulbs from cell # 21 to # 33 were either unscrewed or missing. He testified that it would have been "real tough" to have seen a black man in dark clothing pressed up against a cell around cell # 30 that night. After the cells were opened, there were people walking past him to go down the stairs, but he did not notice any of them. Paquette also stated that there were ten or fifteen people in the vicinity of cell # 30, but he could not identify them.

Another corrections officer, Robert Levesque, testified that he was near the desk in the Flats when he heard someone yell. When he saw Saunders hanging over the rail, he immediately ran upstairs. He testified that at that time, as was customary after the 5:00 opening, there was a large movement of inmates between the tiers. Although he did not recall seeing Clark or anyone run by him as he was climbing the stairs to A Tier, there were probably about thirty inmates aggregated on the two flights. He did not remember who any of them were.

ACI officer John Cunha was working in South State on November 2 in the J, K and L Block. At around 5:30 that night Clark approached him at his desk and asked if Cunha would "please" let him into his cell, cell # 13 on J Tier. Cunha testified that he remembered the incident particularly because Clark had never before said "please" to any of the officers, and he noted that Clark looked drawn and pale.

B. *Physical Evidence*

In searching Clark's cell around midnight on November 2, the state police came across a shirt, a shoe and a sheet, all of which had blood stains on them. On the shirt there were three spots of blood: two

on the front, around the middle of the chest, and another a bit further down on the reverse side. Testing determined that cne of the front spots and the spot on the reverse side were Type A human blood. The second spot on the front of the shirt was of insufficient quantity to be blood-typed. The spot of blood on the shoe was determined to be human blood but also was too small to be blood-typed. Both the victim and the defendant were blood type A. The police officers who conducted the benzidine test on Clark did not observe any cuts or abrasions that might account for the blood.

The second piece of physical evidence originated in Vincent Pope's sighting of Clark and Cannon on G, H, and I Block. On November 12, Pope informed the state police that he thought something had been concealed in the ceiling there. Upon examination, police officers discovered a loose tile in the false ceiling. The ceiling was composed of two-by-four-foot tiles set in a metal frame. In removing the loose tile, the officers discovered a white towel. Wrapped in the towel and inside a black sheath was a makeshift knife about 8⅝ inches long with a 4¼-inch blade and a handle covered in black electrical tape. The loose tile was approximately eleven feet four inches from the floor. There was testimony that on the cell closest to this tile there were four horizontal bars, spaced ten or twelve inches apart, with the highest bar at a height of about six feet from the floor.

Dr. Sturner, the coroner, testified that this knife could have inflicted the two stab wounds found on Saunders. Upon testing, however, no blood was found on either the knife, the towel or the sheath. One expert testified that the knife blade was made of a relatively rough and porous material, which would make it difficult to wash off the blood, particularly after it had dried. In his opinion, blood would probably clot on the knife within thirty seconds. Another expert, however, testified that it would have been "very possible" to remove all traces of the blood beyond detection if the knife were washed within a few minutes of the stabbing.

### C. *Benzidine Test Results*

Application of the benzidine solution yielded positive reactions on various portions of Clark's body: the back of his right hand, the upper right thumb, the top of his left little finger, his left arm from the biceps down the forearm and on the stomach right above the navel. These results were suggestive of the presence of blood. The experts agreed, however, that in order to establish conclusive proof of blood, a follow-up to the benzidine test should have been performed.

Benzidine, while highly sensitive to the presence of blood, cannot establish conclusively that blood is present. There are a number of vegetables and fruits, as well as some chemicals found in common household products, that will be oxidized by the application of a benzidine solution, just as blood is. If the person being tested has had direct skin contact with any of these items,[1] then a false positive may result.

It was disputed at trial whether a false positive would be visibly distinguishable from a reaction to blood. While one expert testified that a false positive would produce the same instantaneous deep blue coloring, another expert testified that the spotting would occur more slowly and that the color would be less intense.

The defense established that Acclaim, a washing detergent that produces a false positive, was in use at the ACI at the time of the murder.

### D. *Overwhelming Evidence of Guilt*

■ We find that the evidence presented at trial, even without the results of the benzidine test, provided overwhelming evidence of guilt. We agree with the district court that this case is therefore distinguishable from *Coppola v. Powell*, 878 F.2d 1562 (1st Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 418, 107 L.Ed.2d 383 (1989).

---

1. Ingestion of one of these items will not result in a false positive. There must have been con-tact with the skin surface being tested.

In *Coppola,* we found that an incriminating statement, admitted in violation of defendant's fifth amendment rights, was not "harmless error beyond a reasonable doubt." *Id.* at 1571. After reviewing the untainted evidence, we held that it did not constitute "overwhelming evidence of guilt." Specifically, we found that the conflicting testimony of three jail inmates "raise[d] serious questions of credibility," that there were "gaps in the identification evidence," and, moreover, that there was "no conclusive evidence that tie[d] petitioner tightly to the crime." *Id.*

In this case there was no conflicting testimony that needed to be reconciled. Inmate testimony, while it may have been inherently suspect because of the inmates' personal motives for testifying, was nonetheless corroborated at various points by the physical evidence: the nature and paths of the wounds roughly comported with Studman's description of the blows aimed by Clark at Saunders; the shank was found in the area in which Pope thought that Clark and Cannon had concealed something; the shank was wrapped in a white towel; Holley saw first Clark and then Cannon carrying a white towel after the stabbing; the shank's size and structure matched the general descriptions given by Studman, Holley and Charles Saunders, and it was capable of inflicting the two wounds.

There was other inculpatory evidence. State police detectives found a shirt and a shoe with blood stains on them in Clark's cell. One guard testified that he had seen Clark on A Tier prior to its opening; another testified that Clark was uncharacteristically polite when he asked to be let back into his cell around 5:30 and that he appeared to be pale and drawn.

While the remaining guards could not confirm Clark's presence anywhere on A Tier that evening, neither could they dis-

prove it, for people were milling about all over the tiers and the stairs. And after Saunders appeared at the rail crying out for help, their attentions were focused entirely on him.

It cannot reasonably be argued that the prosecution unduly emphasized the results of benzidine test in closing arguments. As noted by the district court, the prosecutor himself described the benzidine test results as "icing on the cake." The prosecutor emphasized this evidence more as a manner of corroborating the inmates' testimony than as independent evidence of guilt. He stated: "Studman also said that after the murder, Sidney Clark put the knife in his pants. Do you remember where Lieutenant Hawes got a positive reaction on Sidney Clark, among other places, right on his stomach, right where the knife was placed." The prosecutor reiterated this point almost verbatim later on; then, after referring to the bloodstained shirt and shoes found in Clark's cell, he remarked, "The icing on the cake, and something else that makes Studman and Holley credible, is the Benzidine test.... Is it a mere coincidence that Sidney Clark just happened to have blood, among other places, right on his stomach, right where the inmate[s] said he had put his knife?"

■ We also agree with the district court's determination that the length of jury deliberations and the nature of the questions asked during deliberations[2] should not be interpreted as indicating a reasonable doubt of Clark's guilt or doubts about the credibility of the witnesses. The jury heard sixteen days of testimony. They then spent twenty-two hours, over the course of three days, deliberating. This span of time and the questions asked, rather than indicating indecision, more likely indicated a diligent and conscientious attempt to evaluate the evidence, to verify

---

**2.** On the first night of deliberations, the jury asked for the testimony regarding when Vincent Pope said he saw Clark and Cannon hiding the towel, when Julio Holley said he saw Clark and Cannon at the Jaycee stand and when the prison guard let Clark back into his cell. The next day, the jury asked that all of Robert Studman's

testimony be read back to it. On the last day of deliberations, the court denied a request for a "line drawing" of the ACI's maximum security section and a request that the judge answer a question in his chambers, apparently without defendant and counsel present.

the testimony of different witnesses and to come to a careful and reasoned decision.

The benzidine evidence did not help establish a vital link in the prosecution's case. At most, the benzidine test results added credence to Studman and Holley's testimony in general. As discussed above, however, there was already enough other corroborating evidence to render their stories credible. Moreover, defendant's counsel discounted the test results by establishing that a confirmatory test should have been performed but was not and by raising the possibility that the reaction observed could have been caused by a detergent used at the prison. For these reasons, and in light of the other, overwhelming evidence of Clark's guilt, we find that the introduction of the benzidine test results constituted harmless error.

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

■ Clark argues that his trial counsel were ineffective because they failed to attack the benzidine test on fourteenth amendment due process grounds. In order to prove ineffective assistance of counsel, defendant must satisfy a two-part test. He must show both that counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington,* 466 U.S. at 687, 104 S.Ct. at 2064.

The standard for acceptable performance is whether counsel's conduct constituted "reasonably effective assistance." *Id.* "There is no rigid checklist for this standard; rather, the court must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690, 104 S.Ct. at 2066. It is well-established, nevertheless, that "reasonably effective assistance" does not require an attorney to "divine the judicial development" of the law. *See Elledge v. Dugger,* 823 F.2d 1439, 1443 (11th Cir.1987) ("Reasonably effective representation cannot and does not include a requirement to make arguments based on predictions of how the law may develop."); *Sullivan v.*

*Wainwright,* 695 F.2d 1306, 1309 (11th Cir. 1983) ("The failure of counsel, in 1974, to advance certain points on appeal which subsequently gained judicial recognition does not render counsel ineffective.... [Defendant] does not direct us to any case decided at that time and overlooked by counsel.").

Defendant in this case argues that his counsel should either have been aware of the carcinogenic effects of benzidine or should have anticipated and explored that possibility. We have found no case law prior to 1976, however, that would have alerted defendant's counsel to benzidine's carcinogenic effects, nor has defendant argued that any exists. It was not the duty of defendant's counsel to explore all new and novel avenues of defense, particularly when he had done an admirable job of discounting the effect of the test results by exposing the need for a confirmatory test and exploring the possibility of false positives.

Moreover, even if defendant could show that his attorneys' performance was deficient, we find that this conduct did not prejudice his defense. As discussed above, we find beyond a reasonable doubt that the admission of the benzidine test results did not affect the outcome of the trial. Therefore, we find that defendant's argument fails on each prong of the *Strickland* test and that the conduct of defendant's counsel did not constitute ineffective assistance of counsel.

## IV. CONCLUSION

In summary, we hold that the introduction of the benzidine test results constituted harmless error in light of the other, overwhelming evidence of defendant's guilt. We also find that the failure of defendant's counsel to question the constitutionality of the benzidine test did not constitute ineffective assistance of counsel because there was no legal precedent for such an action. Affirmed.