William S. HABEREK, Petitioner,

v.

Michael T. MALONEY, Commissioner
of Correction, Respondent.

No. 98–12063–EFH.

United States District Court,
D. Massachusetts.

Jan. 7, 2000.

Stephen Neyman, Boston, MA, for William S. Haberek, plaintiff.

Cathryn A. Neaves, Gregory I. Massing, Attorney General's Office, Boston, MA, for Michael T. Maloney, defendant.

### MEMORANDUM AND ORDER

HARRINGTON, District Judge.

William Haberek ("petitioner") petitions this Court for habeas corpus relief pursuant to 28 U.S.C. § 2254. For the following reasons, the petition is denied.

### I. INTRODUCTION

On November 27, 1985, petitioner was convicted of first-degree murder and unlawful possession of a shotgun; petitioner was sentenced to life imprisonment. On December 6, 1985, the petitioner filed a timely notice of appeal to the Supreme Judicial Court of Massachusetts ("SJC"). On April 6, 1988, the SJC affirmed the convictions. *See Commonwealth v. Haberek,* 402 Mass. 105, 111, 520 N.E.2d 1303 (1988). On August 1, 1992, the petitioner filed a Motion for New Trial. On August 18, 1992, the trial judge denied the motion without a hearing. On January 24, 1995, a single justice of the SJC ruled that it was error to deny petitioner's Motion for New Trial without a hearing, and remanded the matter for hearing. *See Haberek v. Com-*

*monwealth*, 421 Mass. 1005, 657 N.E.2d 228 (1995). On June 11, 1997, a hearing was held on all pending matters. On August 1, 1997, the trial judge again denied the Motion for New Trial. On February 26, 1998, a single justice of the SJC denied petitioner's leave to appeal. On October 15, 1998, the petitioner filed this Petition for Writ of Habeas Corpus.

The petitioner argues that he is entitled to relief for the following reasons: (1) the Commonwealth impermissibly used petitioner's invocation of his right to remain silent at trial; (2) the April 6, 1988 decision of the Supreme Judicial Court improperly applied the principles of *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); (3) the February 26, 1998 decision of the single justice to deny petitioner's leave to appeal misstates facts and ignores case law; (4) the petitioner was denied effective assistance of counsel when his attorney failed to adequately prepare for trial; (5) petitioner was denied effective assistance of counsel when his attorney failed to object to an allegedly erroneous intoxication instruction; (6) petitioner was denied effective assistance of counsel when his attorney failed to object to an allegedly erroneous malice instruction; (7) the allegedly erroneous intoxication instruction itself led to a miscarriage of justice; and (8) the allegedly erroneous malice instruction itself led to a miscarriage of justice.

## II. *FACTUAL BACKGROUND*

This Court adopts the SJC's factual findings which form the basis of petitioner's conviction:

> From the evidence presented at trial, the jury could have found that at approximately 1 A.M. on October 13, 1984, Deborah DeGrandis was driven to her home at 21 Pond Street in Dorchester by her boyfriend, Joseph Joyce (victim). When they pulled up to the curb and stopped, DeGrandis reached to the floor of the automobile for her pocketbook and heard her boyfriend say, "What the . . . ." As she turned to look, she saw the barrel of a shotgun pointed at the driver's side window. When she heard Joyce say, "[G]et out," she opened the passenger side door, slipped out of the automobile, and ran up Edison Green Street. She heard shots as she was running away.

Three other residents of Pond Street witnessed the shooting. Virginia Morad of 19 Pond Street was awakened by a loud noise at 1:10 A.M. She went to her window and saw a man pointing and firing a gun into a station wagon, and a young girl running up Edison Green Street, crying hysterically. She described the gunman as a white male of average height, wearing a dark "leatherette" type jacket. After the shots were fired, she watched the man walk to a maroon automobile parked nearby and drive away.

Kevin Lee, a former police officer, heard a shotgun blast outside his home at 11 Pond Street. He went to his window and observed a white male, thirty to thirty-two years old, wearing a dark jacket, standing two feet from a station wagon, and holding what appeared to be a sawed-off shotgun. He saw the man fire at the windows of the automobile, shattering the glass. He then watched the assailant enter a maroon Mercury automobile and drive away. He looked for, but could not see, a registration plate on the escaping vehicle.

A fifteen-year-old girl who lived at 17 Pond Street also observed the shooting. She was looking out her window when the victim pulled up to the curb in his station wagon. She witnessed a man in a black jacket pull up in another automobile, open his trunk, and remove a gun. At this point, she observed the victim leave the station wagon and run up Pond Street. She saw a girl get out of the car and run in the opposite direction. She observed the gunman shoot out the rear window of the station wagon and then fire toward the fleeing

victim. The assailant then turned, and continued to shoot at the station wagon.

Boston Police found the victim, lying in a pool of blood on Pond Street, approximately 110 feet from his automobile. The victim was removed by ambulance to Boston City Hospital, where he died as a result of shotgun wounds to his head. Three shotgun shells and a woman's pocketbook were found near the damaged station wagon. It was later established that the shells were fired from the defendant's gun.

Less than one hour after the Pond Street shooting, Boston Police officers responded to a report of shots being fired in the area of Dorchester and West Second Streets near O'Leary's Pub in South Boston. When the officers arrived, their attention was drawn to three men standing outside a maroon Mercury automobile. They saw one man, the defendant, bend into the vehicle through the open door on the driver's side. When the officers approached the automobile, they observed a sawed-off shotgun on the floor of the passenger's side of the automobile, and immediately placed the defendant and the other two men under arrest. The officers observed that the registration plate of the automobile was bent down so the numbers could not be seen. Further investigation revealed that both the shotgun and the automobile belonged to the defendant. *See Commonwealth v. Habarek*, 402 Mass. 105, 105–07, 520 N.E.2d 1303 (1988).

## III. *STANDARD OF REVIEW*

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 110 Stat. 1214, was enacted on April 24, 1996, and amended 28 U.S.C. § 2254 to change the standard by which federal courts review the habeas petition of a person in custody pursuant to the judgment of a state court. Under 28 U.S.C. § 2254, a state court conviction may be reviewed by a federal court only if state court adjudications re-

sulted in decisions "contrary to, or involved in an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *See* 28 U.S.C. § 2254 (1998). Specifically, Section 2254(d) provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim ... resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

■■■ The United States Court of Appeals for the First Circuit has set forth a two-step analysis for examining claims for habeas relief under this statute. *See O'Brien v. Dubois*, 145 F.3d 16 (1st Cir. 1998). The first step requires the federal court to inquire "whether the Supreme Court has prescribed a rule that governs the petitioner's claim." *See id.* at 24. This first step is triggered only if the Supreme Court rule "can be fairly said to require a particular result in a particular case." *See id.* at 25. If the Supreme Court has prescribed such a rule, then the federal court must determine "whether the state court's decision is 'contrary to' the governing rule." *See id.* at 24. Under this first inquiry, the "habeas petitioner must show that Supreme Court precedent requires an outcome contrary to that reached by the relevant state court." *See id.* at 24–25. A petitioner may succeed under the "contrary to" clause only if "Supreme Court case law directly governs the claim and the state court got it wrong." *See Vieux v. Pepe*, 184 F.3d 59, 63 (1st Cir.1999).

■■■ The second step of habeas review applies when there is no clear rule requiring a specific outcome which governs petitioner's claim. In such cases, the federal court must determine whether the state

court's use of (or failure to use) existing law in deciding the petitioner's claim involved an "unreasonable application of Supreme Court precedent." *See O'Brien,* 145 F.3d at 25. A decision is to be deemed unreasonable only when it is "so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate that it is outside the universe of plausible, credible outcomes." *See id.*

It is always a most serious matter and weighty responsibility for an individual federal trial judge to review the judgment of a state's highest appellate court.

## IV. DISCUSSION

### A. The Right to Remain Silent

The first three of petitioner's arguments relate to the improper reference by the prosecution of defendant's invocation of his right to remain silent. The petitioner claims that, during trial, the Commonwealth elicited testimony that "violated the spirit of the privilege against self-incrimination." After his arrest, the defendant voluntarily had waived his Miranda rights, and made a statement to Officer Tinlin. The Commonwealth, through Officer Tinlin, offered the following testimony:

*Prosecutor (Direct examination):*

All right. Relate to the jury, sir, what happened.

*Detective Tinlin:*

He told me his name was William S. Haberek. He was 32 years of age, and he was born June 1, 1952. He was living on the second floor of 16 Dorset Street with his mother. He told me that he was in O'Leary's Pub all day until closing time at 2:00 a.m., and he had been in there all night drinking with Phillip Oulette and John Hughes. He stated, too, that they were standing at the bar all night because there were no booths there.

I then inquired to him about the shotgun that was in his car. He told me that there were two guns in his car, a shotgun and a rifle. He stated to me that the guns were his. They were in his car locked in there all day. They were there when he left to go into the bar, and they were there when he went to the car and was arrested. He told me that the shotgun was in the passenger's seat and that the rifle was in the trunk.

Then at this point he said to me, "**I don't think I want to say any more,**" and then I stopped making any inquiries of him relative to the shooting.

*Defense Counsel (Cross Examination):*

And you knew how significant it [defendant's statement] was because you gave him his Miranda warnings?

*Detective Tinlin:*

Yes, sir.

*Defense Counsel:*

But you didn't think to tape that one, did you?

*Detective Tinlin:*

I had intended to tape it.

*Defense Counsel:*

You had intended to tape it?

*Detective Tinlin:*

I did.

*Defense Counsel:*

Did you tape it?

*Detective Tinlin:*

"**He terminated it.**" It was nothing to tape.

*Prosecutor (Re-direct Examination):*

Will you tell the jury, sir, why you didn't tape it?

*Detective Tinlin:*

**He exercised his right to remain silent so I terminated the conversation.**

*Prosecutor:*

If the statement with the defendant had not terminated at that point, would you have tape recorded it?

*Detective Tinlin:*

I would have tape recorded further conversation, yes, sir. (emphasis added).

Additionally, in his closing argument, the prosecutor referred to the defendant's post-arrest silence in the following manner:

In the course of the statement, the defendant tells Robert Tinlin that he was in O'Leary's Pub all day, until 2 o'clock and then he was drinking with Oulette and Hughes at the bar, because there were no booths.

That is what the defendant tells Detective Tinlin, and, that he had two guns in his car, and that they were locked there all day. They were locked in his car when he went to the car, and they were locked in his car when he came out of the bar, and they were there when he was arrested. The shotgun, which was in the front seat, passenger door, and a rifle in the trunk.

And, then at some point, Detective Tinlin testified, ladies and gentlemen, that **the defendant terminated the conversation and said he didn't want to talk about it any more.** (emphasis added).

Petitioner claims that Detective Tinlin's testimony and the prosecutor's closing arguments concerning the defendant's wish not to "say any more" constitute a violation of the rule prescribed by the Supreme Court in *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). *Doyle* holds that "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving Miranda warnings, violate[s] the Due Process Clause of the Fourteenth Amendment." *See* 426 U.S. at 619, 96 S.Ct. 2240. The defendants in *Doyle* offered an exculpatory statement at trial that had not previously been told to the police. *See id.* at 613, 96 S.Ct. 2240. On cross-examination, the prosecutor in *Doyle* questioned each defendant as to why he had not told the exculpatory explanation at the time of arrest. *See id.*

### 1. *The Doyle Standard*

Miranda requires that a person taken into custody be advised immediately that he has the right to remain silent, and that anything said may be used against him. *See id.* at 617, 96 S.Ct. 2240. The *Doyle* Court recognized that silence in the wake of these warnings may be nothing more than the arrestee's exercise of his Miranda rights. *See id.* The Supreme Court reasoned that "every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested." *See id.* Furthermore, the court reasoned that Miranda carries with it an implicit assurance that "silence will carry no penalty." *See id.* at 618, 96 S.Ct. 2240. "It would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an [exculpatory] explanation subsequently offered at trial." *See id.* Thus, the rule proscribed in *Doyle* is limited to the prosecution's improper use of a defendant's post-arrest silence in order to impeach an exculpatory statement offered by the defendant at trial. *See id.*

The Supreme Court has carefully drawn the boundaries of a *Doyle* violation. The Supreme Court has recognized that, "it is significant that in each of the cases in which this Court has applied *Doyle*, the trial court has permitted *specific inquiry* or argument respecting the defendant's post-Miranda silence." *See Greer v. Miller*, 483 U.S. 756, 763, 107 S.Ct. 3102, 3107, 97 L.Ed.2d 618 (1987) (citations omitted). In *Greer*, the prosecutor asked one question that "touched upon [defendant's] post-arrest silence." *See id.* at 764, 107 S.Ct. 3102. However, this did not rise to the level of a *Doyle* violation because the prosecutor was "not allowed to undertake impeachment on or permitted to call attention to [defendant's] silence." *See id.*

Furthermore, the rule announced in *Doyle* does not apply to impeachment testimony regarding prior inconsistent statements made after Miranda warnings. *See Anderson v. Charles*, 447 U.S. 404, 408, 100 S.Ct. 2180, 2182, 65 L.Ed.2d 222 (1980). The Supreme Court has reasoned

that a defendant who has made a voluntary waiver of Miranda rights has "not been induced to remain silent." *See id.* As to the subject matter of such statements, the defendant has not remained silent at all. *See id.* Thus, no *Doyle* violation occurs where questions are "not designed to draw meaning from silence, but to elicit an explanation for a prior inconsistent statement." *See id.* at 409, 100 S.Ct. 2180.

### 2. *Application of the Doyle Standard*

█ The first step of habeas analysis does not apply in this case. *Doyle* does not require a "particular result" in this particular case. *Doyle* does not require a result *contrary* to that reached by the state court in this case; petitioner's silence was not used to impeach an exculpatory statement offered at trial. Petitioner waived his Miranda rights in order to make a post-arrest statement. It was after petitioner had already waived his Miranda rights (and made a statement) that he then stated, "I don't think I want to say any more." The use of such a statement in the prosecution's case and closing argument is not contrary to the rule announced *Doyle.*

The issue before this Court, therefore, is whether the state court's use of (or failure to use) *Doyle* in deciding the petitioner's claim involved an "unreasonable application of Supreme Court precedent." *See O'Brien,* 145 F.3d at 25. "This reduces to a question of whether the state court's derivation of [*Doyle*] ... appears objectively reasonable." *See id.* The Supreme Judicial Court briefly addressed this issue in Petitioner's appeal. *See Commonwealth v. Habarek,* 402 Mass. 105, 110, 520 N.E.2d 1303 (1988). The SJC made the following statements regarding this issue:

> Officer Tinlin's testimony on direct examination concerning the defendant's request to end the interrogation was introduced in the context of the entire conversation, and was admitted so as not to leave the jury wondering why the

interview ended abruptly. The officer's testimony on redirect examination was properly admitted in response to the inferences left by defense counsel on cross-examination. (citing *United States v. Robinson,* 485 U.S. 25, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988)). At no time did the Commonwealth use the defendant's statement as evidence of his guilt, or to impeach an explanation subsequently offered at trial. (citations omitted). There was no error. *See Habarek,* 402 Mass. at 110, 520 N.E.2d 1303.

The state court's interpretation of *Doyle* was not unreasonable. A decision is to be deemed unreasonable only when it is "so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate that it is outside the universe of plausible, credible outcomes." *See O'Brien,* 145 F.3d at 25. The state court was well aware that *Doyle* applies to the improper impeachment of subsequent exculpatory explanations offered at trial. The state court was well aware that petitioner's statement came after a voluntary waiver of Miranda, and was not offered to impeach any subsequent exculpatory explanation or as evidence of guilt. *See Habarek,* 402 Mass. at 110, 520 N.E.2d 1303.

### 3. *Circuit Court Decisions Interpreting Doyle*

█ That the state adjudications were not an unreasonable application of Supreme Court precedent was well supported by the case law, both at the time of petitioner's appeal, and now. Prior to the 1988 SJC decision, it was well established that direct testimony of a police officer, referring to defendant's post-Miranda silence, was not an automatic *Doyle* violation. In fact, many cases reveal that the mere testimony of a police officer that a defendant "refused to answer further questions" or "invoked the Fifth Amendment" as part of a descriptive narrative does not always constitute a *Doyle* viola-

tion.[1] *Doyle* does not forbid all mention at trial of Miranda warnings, and a defendant's response to them. Indeed, the United States Court of Appeals for the First Circuit has stated that *Doyle* "does not establish a rule which gives rise to constitutional error in every case in which the prosecutor refers to the defendant's post-arrest silence." *See Grieco v. Hall,* 641 F.2d 1029, 1033 (1st Cir.1981). In order for a witness' remarks to constitute an impermissible comment on silence, the remarks must (1) exhibit a manifest intent to comment on silence or (2) be of such a nature that a jury would naturally and necessarily construe the remarks as a comment on defendant's silence. *See, e.g., United States v. Pennington,* 20 F.3d 593, 599 (5th Cir.1994); *United States v. Ramos,* 932 F.2d 611, 615 (7th Cir.1991); *United States v. Vera,* 701 F.2d 1349 (11th Cir.1983).[2]

1. This Court conducted an exhaustive review of approximately fifty circuit court cases with closely parallel facts from 1976 through present. Extensive research reveals that direct testimony by a police officer (as part of the prosecution's case-in-chief) which refers to a defendant's silence or invocation of the Fifth Amendment, is often not considered a violation of *Doyle.* *See, e.g., Splunge v. Parke,* 160 F.3d 369, 373 (7th Cir.1998) (*Doyle* does not forbid all mention at trial of Miranda warnings and a defendant's response to them); *Noland v. French,* 134 F.3d 208, 216 (4th Cir.1998) (mere mention of a defendant's exercise of Miranda rights is not per se prohibited, especially in the context of officers' narratives regarding arrest); *United States v. Higgins,* 75 F.3d 332, 333 (7th Cir.1996) (*Doyle* does not forbid all mention at trial of defendant's response to Miranda); *United States v. Pennington,* 20 F.3d 593, 599 (5th Cir.1994) (test for *Doyle* error is whether the "manifest intent" of remarks was to comment on a defendant's silence or whether the jury would naturally and necessarily construe it as a comment on the defendant's silence); *United States v. Sizemore,* 991 F.2d 797 (6th Cir. 1993) (no *Doyle* violation where prosecutor never undertook to impeach the defendant on his post-arrest silence); *United States v. Dessens–Fimbres,* 988 F.2d 123 (9th Cir.1993) (no *Doyle* violation where prosecutor did not stress an inference of guilt from silence); *Lindgren v. Lane,* 925 F.2d 198, 201 (7th Cir. 1991) (no *Doyle* violation where defendant simply responded that he didn't "wish to say any more" at the tail end of an answer to a question by the police officer); *Carpenter v. Morris,* 914 F.2d 255 (6th Cir.1990) (no *Doyle* violation because it was unlikely that a negative inference could be drawn from petitioner's silence); *Lovett v. Foltz,* 884 F.2d 579 (6th Cir.1989) (no *Doyle* violation because mere statement that defendant didn't want to make a statement was not improper impeachment of post-Miranda silence); *United States v. Grubczak,* 793 F.2d 458, 462 (2nd Cir.1986) (no *Doyle* error where prosecutor did not impeach the defendant based on his post-arrest silence); *Solomon v. Kemp,* 735 F.2d 395, 400 (11th Cir.1984) (no *Doyle* violation where testimony did not raise inference of guilt and was not used to impeach subsequent exculpatory story); *United States v. Crowder,* 719 F.2d 166, 172 (6th Cir.1983) (no *Doyle* violation where questions did not seek to impeach defendant's subsequent exculpatory story).

2. Although the cases are far from unanimous, the overwhelming majority of those cases with the most similar facts have found either (1) no *Doyle* violation or (2) harmless error. Most of the "harmless error" cases apply the previously-used standard set forth in *Chapman v. California.* *See* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967) (error does not require reversal if error is harmless beyond a reasonable doubt); *see also United States v. Wiley,* 29 F.3d 345, 349 (8th Cir. 1994); *United States v. Hernandez,* 948 F.2d 316, 324 (7th Cir.1991); *Pender v. Davis,* 817 F.2d 757 (6th Cir.1987); *United States v. Harrold,* 796 F.2d 1275, 1281 (10th Cir.1986); *Wallen v. Fletcher,* 803 F.2d 722 (6th Cir. 1986); *United States v. Elkins,* 774 F.2d 530, 538 (1st Cir.1985); *United States v. Ruz–Salazar,* 764 F.2d 1433, 1437 (11th Cir.1985); *Stokes v. Procunier,* 744 F.2d 475, 479 (5th Cir.1984); *Booton v. Hanauer,* 541 F.2d 296, 299 (1st Cir.1976).

The minority of cases which have granted habeas relief based on similar facts focused on the impermissibility of "specific impeachment inquiry" regarding a defendant's post-Miranda silence. *See Greer v. Miller,* 483 U.S. 756, 764, 107 S.Ct. 3102, 3107, 97 L.Ed.2d 618 (1987); *see also Freeman v. Class,* 95 F.3d 639, 643 (8th Cir.1996) (prosecutor specifically elicited from police officer three occasions of defendant's post-arrest silence); *United States v. Newman,* 943 F.2d 1155, 1157 (9th Cir.1991) (prosecutor elicited testimony regarding defendant's decision to remain silent on three occasions with focused questions); *Matire v. Wainwright,* 811 F.2d 1430, 1435 (11th Cir.1987) (prosecutor's repeated questions showed a manifest intent to highlight the defendant's silence).

Even under the pre-AEDPA standard for habeas review, it is not evident that Detective Tinlin's statements or the prosecutor's closing argument would constitute a violation of *Doyle.* Detective Tinlin merely testified that the defendant terminated the conversation and exercised his right to remain silent. The reference was not used to impeach an exculpatory story offered by the defendant as proscribed by *Doyle.* Indeed, the statements were made at the tail end of a statement given by the defendant after a voluntary waiver of his Miranda rights.

Indeed, the Supreme Court has held that a "defendant who voluntarily speaks after receiving Miranda warnings has not been induced to remain silent at all." *See Anderson,* 447 U.S. at 408, 100 S.Ct. 2180. There is no doubt that a defendant may reassert his right to remain silent at any time, subject to the continuing protections of *Doyle. See United States v. Scott,* 47 F.3d 904, 907 (7th Cir.1995). However, courts have held that once a defendant chooses to make a post-Miranda voluntary statement, the jury, "in order to have the benefit of all relevant evidence, may well learn that the defendant terminated his statement by exercising his right to remain silent." *See, e.g., United States v. Crowder,* 719 F.2d 166, 171 (6th Cir.1983); *Lofton v. Wainwright,* 620 F.2d 74, 77 (5th Cir.1980).

Regardless, it cannot be said that the introduction of Detective Tinlin's testimony or the statements in the prosecutor's closing argument during the state adjudications constituted an unreasonable application of federal law as decided by the Supreme Court. The introduction of such testimony and argument was not so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate that it is outside the universe of plausible, credible outcomes.

4. *Petitioner's Reliance on Coppola v. Powell*

Subsequent to petitioner's appeal and decision by the Supreme Judicial Court in 1988, *Habarek,* 402 Mass. 105, 520 N.E.2d 1303 (Mass.1988), the United States Court of Appeals for the First Circuit decided *Coppola v. Powell,* 878 F.2d 1562 (1st Cir. 1989) (defendant's pre-arrest statements that he would not confess violates Due Process). Petitioner further argues that the February 26, 1998, denial of his leave to appeal by a single justice ignores the holding in *Coppola.* The single justice reasoned that petitioner's argument was not new, "nor does the point attain the requisite novelty by virtue of the intervening decision in *Coppola.*" *See Commonwealth v. Habarek,* Crim. No. 97–0609, Memorandum of Decision at 3 (Mass. February 26, 1998). The single justice reasoned that *Coppola* was "an application, in circumstances quite different from those presented here, of the rule in *Doyle.*" *See id.*

The intervening decision in *Coppola* does not allow petitioner's claim to succeed for the following reasons: (1) *Coppola* is not a rule prescribed by the Supreme Court; (2) *Coppola* was decided after the 1988 SJC decision of petitioner's appeal, and was not declared to have retroactive application; and (3) even if *Coppola* were applicable, the 1998 decision of the single justice was not an unreasonable application of *Doyle* because *Coppola* was factually different (it applies to pre-arrest statements and does not deal with a post-Miranda statement made after a voluntary waiver by defendant). Finally, extensive research has revealed numerous circuit court cases, *more* factually on point than *Coppola,* which stand for the proposition that the state adjudications in this case were *not* an unreasonable application of *Doyle* and its progeny.

It cannot be said that the introduction of petitioner's post-waiver statement (which included his wish not to speak further), or the state's upholding of its use is "so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate that it is outside the universe of plau-

sible, credible outcomes." *See O'Brien,* 145 F.3d at 25. The state's application of law in deciding this issue was not an unreasonable application of Supreme Court precedent. As such, this Court denies petitioner's claims for habeas relief on this issue.

### 5. *Harmless Error*

 Even if the admission of Detective Tinlin's statement and the prosecutor's argument were to constitute error, this Court holds that such error is harmless. The Supreme Court has held that the *Kotteakos* harmless-error standard applies to *Doyle* violations. *See Brecht v. Abrahamson,* 507 U.S. 619, 638, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993) (citing *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)). Under this standard, a petitioner is entitled to habeas relief only if he can establish that the error resulted in "actual prejudice" and "had substantial and injurious effect in determining the jury's verdict." *See id.* Given the lengthy and extensive nature of the trial testimony, and the significant amount of evidence put forth against the defendant, this Court concludes that the mere reference by Officer Tinlin and the prosecutor's reference in closing argument did not result in actual prejudice or have any substantial and injurious effect in determining the jury's verdict. Defendant's wish to terminate the conversation came at the end of a voluntary statement, and was not used by the prosecutor to impeach an exculpatory story offered by the defendant. Unlike most *Doyle* cases, the statements were not elicited through specific prosecutorial questioning. Rather, they came at the end of Detective Tinlin's narrative, and must be viewed in this context. The statements do not call for any inference of guilt, and as such, are harmless under the harmless error standard espoused in *Brecht v. Abrahamson. See* 507 U.S. at 638, 113 S.Ct. 1710.

### B. *Erroneous Instructions*

 Petitioner claims that two of the jury instructions were erroneous such as to violate due process. An error in instructing the jury is not a basis for habeas relief, however, unless the error *rendered the trial so fundamentally unfair, and so infected the entire trial,* that the resulting conviction violates due process. *See Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973) (emphasis added). In order to grant habeas relief, it must be established not merely that the instruction is "undesirable, erroneous, or even universally condemned," but that the instruction violated a constitutional right. *See id.* Additionally, instructions may not be judged in artificial isolation, but must be considered in the "context of the instructions as a whole" and the entire trial record. *See Cupp,* 414 U.S. at 147, 94 S.Ct. 396. It is also important to remember that the Supreme Court has defined the category of infractions that violate "fundamental fairness" very narrowly. *See Dowling v. United States,* 493 U.S. 342, 352, 110 S.Ct. 668, 674, 107 L.Ed.2d 708 (1990).

Petitioner claims that instructions on (1) intoxication and (2) malice were erroneous and caused a miscarriage of justice.

### 1. *Intoxication Instruction*

 The intoxication instruction is as follows:

Now I want to talk to you about intoxication. There has been some mention here of drinking. And, it is for you to say whether there was any drinking and how much, and so forth. But, I just want to tell you the effect of intoxication in this particular case. Intoxication bears on the question of murder in the first degree based upon deliberate premeditation. Intoxication may affect the defendant's ability to reason, and his ability to deliberately premeditate. The rule is; that evidence of voluntary intoxication, while not a complete defense,

can reduce to second degree, a charge of first-degree murder.

Voluntary intoxication is never an excuse, or palliation for crime. It would be subversive of all law and morality of the commission if one vice, like drunkenness, should be allowed to excuse a crime. One might be perfectly unconscious of what he is doing, and yet be responsible for his conduct during drunkenness. Drunkenness is no excuse for the unlawful, intentional killing of a human being with malice aforethought, that is second-degree murder. No matter how drunk one may be, and no matter what the intention may be, the law does not permit drunkenness under such .circumstances to be an excuse for the crime.

On the question of murder in the first degree, deliberately premeditated, if you are satisfied upon the evidence that the defendant killed the deceased, but that he was incapable of conceiving a *deliberately premeditated intention to kill* because of his intoxication, then he is not guilty of murder in the first degree but he is guilty of murder in the second degree. This is because deliberate premeditation is required, and if a man is overcome by liquor that he is incapable of deliberately premeditating, then the law says out of kindness to him in that situation that he is not guilty of murder in the first degree, but he is guilty of murder in the second degree. (emphasis added).

This instruction clearly directs the jury to consider intoxication in deciding on the issue of "deliberate premeditation." Petitioner argues, however, that this instruction constituted a violation of due process because the judge failed to instruct the jury that it could consider intoxication in deciding on "specific intent." Petitioner relies on *Commonwealth v. Henson,* 394 Mass. 584, 476 N.E.2d 947 (1985), which held that "where proof of a crime requires proof of a specific criminal intent and there is evidence tending to show that the defen-

dant was under the influence of alcohol ... the judge should instruct the jury, if requested, that they may consider evidence of the defendant's intoxication ... in deciding whether the Commonwealth has proved that specific intent beyond a reasonable doubt." The Commonwealth argues, as the trial judge and single justice have held, that the rule in *Henson* was not applied to "murder" specific intent until after petitioner's trial. *See Commonwealth v. Grey,* 399 Mass. 469, 505 N.E.2d 171 (1987). Petitioner argues that (1) the *Henson* rule was never limited to any specific crime, and (2) the *Grey* application of the *Henson* rule to murder was decided *before* the SJC decided petitioner's appeal. This Court holds that the instruction was proper at the time it was given, as the instruction was what was required by the prevailing law at the time of trial. *See Commonwealth v. Henson,* 394 Mass. 584, 476 N.E.2d 947 (1985). The trial judge noted "at the time the jury was instructed ... the instruction given was proper." *See Commonwealth v. Haberek,* Crim. Nos. 049800, 050092, Memorandum of Decision at 17 (Mass. August 1, 1997). Similarly, the single justice correctly ruled in 1998 that the rule in *Henson* was not applied to murder until after petitioner's trial, and did not afford it retroactive application. *See Commonwealth v. Haberek,* Crim. No. 97–0609, Memorandum of Decision at 5–6 (Mass. February 26, 1998).

█ In any case, the failure of a trial court to charge on intoxication or its possible effect on specific criminal intent does not constitute a denial of the Due Process Clause so as to justify habeas corpus relief. The Supreme Court has held that an instruction that a jury "could not consider [defendant's] intoxicated condition" in determining the existence of a mental state which is an element of the offense does not violate the Due Process Clause, because it offends neither a fundamental principle of fairness nor the requirement that the state prove *mens rea* beyond a reasonable doubt. *See Montana v. Egelhoff,* 518 U.S.

37, 40–56, 116 S.Ct. 2013, 2016–24, 135 L.Ed.2d 361 (1996) (state does not commit Constitutional error by failing to give intoxication instruction); *see also Burton v. Hill,* 187 F.3d 646 (9th Cir.1999); *United States ex rel. Smith v. Montanye,* 505 F.2d 1355 (2nd Cir.1974). Due Process is not violated by a jury instruction which prohibits the consideration of intoxication in determining the existence of a mental state which is an element of the offense. *See id.* As such, this Court denies petitioner's claims for habeas relief on this issue.

### 2. *Malice Instructions*

Petitioner challenges the malice instructions on three grounds: (1) the statement "malice is an intent to inflict unlawful injury" is an unconstitutional conclusive presumption, (2) the judge improperly combined the second and third prongs of the definition of malice, and (3) the judge improperly instructed on deliberate premeditation and the third prong of the definition of malice in light of a subsequent SJC case.

### a. *Conclusive Presumption*

 This Court holds that the statement "malice is an intent to inflict unlawful injury" fails to constitute a conclusive presumption, let alone an unconstitutional conclusive presumption. In its 1997 denial of defendant's Motion for New Trial, the trial judge correctly and reasonably examined the instruction in the context of the exhaustive instructions on malice as a whole and the entire trial record. *See Cupp,* 414 U.S. at 147, 94 S.Ct. 396. As such, the trial judge concluded that the "instruction as a whole . . . did not vitiate the adequacy of the malice instructions." *See Commonwealth v. Haberek,* Crim. Nos. 049800, 050092, Memorandum of Decision at 19 (Mass. August 1, 1997). The

instruction must be more than undesirable, erroneous, or even universally condemned. As such, the inclusion of this instruction is neither contrary to nor an unreasonable application of federal law as decided by the Supreme Court.

### b. *Combining the Second and Third Prongs of Malice*

 The trial judge instructed:

If a man *intentionally,* without any legal justification, excuse, or extenuation uses upon the body of another, a force, such as a gun, a knife, or whatever, or any other instrument, a force, such that as used would **probably do grievous bodily harm** to that other **and** would **create a plain and strong likelihood** that the other would die as a result, you the jury, may infer that the act was done maliciously . . . (emphasis added)

Petitioner argues that this instruction (1) improperly uses the word **"probably,"** and (2) improperly combines language associated with the second prong of malice ("intent to do bodily harm") with language associated with the third prong of malice ("plain and strong likelihood" of death) by using the word **"and."** [3] The trial judge found that, "if anything, it was more favorable to the defendant . . . as it may have led the jury" to believe that *both* prongs of malice were required.

First, the trial judge observed that "these two phrases are somewhat redundant, and either would have sufficed." This Court agrees, and holds that there is no reasonably significant difference between an instruction which reads **"probably do grievous bodily harm"** and **"intent to do grievous bodily harm."** Elsewhere, the instructions clearly define specific intent, and on multiple instances, require specifically, "intent to do grievous bodily harm." The single justice found that the

---

**3.** The first prong of malice is generally associated with language such as a "plan to kill or the resolution and purpose to kill." The second prong is associated with language such as "intent to do grievous bodily harm." The

third prong is associated with language referring to action which would "create a plain and strong likelihood of resulting death." *See, e.g., Commonwealth v. Grey,* 399 Mass. 469, 471 n. 1, 505 N.E.2d 171 (1987).

"instruction on deliberate premeditation was correct and clear, so that a reasonable juror could only have understood that a guilty verdict ... by reason of deliberate premeditation required a finding of purposeful conduct that included a finding beyond a reasonable doubt of a specific intent to kill." *See Commonwealth v. Haberek,* Crim. No. 97–0609, Memorandum of Decision at 7 (Mass. February 26, 1998). This Court agrees, and holds that the melding of the second and third prongs, and the use of the word "probably," viewed in context of the instructions as a whole, do not afford petitioner with a basis for habeas relief. The instruction did not render the trial so fundamentally unfair, and so infect the entire trial, that the resulting conviction violated due process. *See Cupp,* 414 U.S. at 146–47, 94 S.Ct. 396.

### c. *Deliberate Premeditation and the Third Prong of Malice*

██ The trial judge instructed, "that in order that the jury may find that there was deliberate premeditation, they should be satisfied beyond a reasonable doubt that the plan to kill or the resolution and purpose to kill, or the intent to do grievous bodily harm, or the intent to do an act creating a plain and strong likelihood that the victim's death or grievous bodily harm would follow was formed in the defendant's mind sometime before the act of killing."

Petitioner challenges this instruction based on a subsequent decision of the SJC. *See Commonwealth v. Judge,* 420 Mass. 433, 650 N.E.2d 1242 (1995). In *Judge,* the SJC held that the third prong of malice ("intent to do an act creating a plain and strong likelihood ...") can support a first-degree murder conviction based only on the theory of extreme atrocity and cruelty—a theory not present in petitioner's case. *See id.* at 437, 650 N.E.2d 1242. The trial judge admits that such instruction might "today be erroneous in light of *Judge.*" However, the instruction was correct at the time of petitioner's trial and 1988 appeal to the SJC. The trial judge

further reasoned that even if *Judge* had existed at the time of trial, this error could not "have had any impact on the jury's verdict." *See Commonwealth v. Haberek,* Crim. Nos. 049800, 050092, Memorandum of Decision at 22 (Mass. August 1, 1997). The trial judge noted that, prior to this instruction, he had given a thorough explanation of deliberately premeditated malice aforethought, such that "a reasonable juror could only have understood that a guilty verdict ... required a finding of purposeful conduct that included a finding beyond a reasonable doubt of a specific intent to kill." *See id.*

Even if said instruction were erroneous, it did not constitute any violation of federal law. It did not render the trial so fundamentally unfair, and so infect the entire trial, that the resulting conviction violated due process. *See Cupp,* 414 U.S. at 146–47, 94 S.Ct. 396. As such, the inclusion of this instruction is neither contrary to nor an unreasonable application of federal law as decided by the Supreme Court. Thus, this Court denies petitioner's claims for habeas relief on this issue.

### C. *Ineffective Assistance of Counsel*

Finally, petitioner argues that he received ineffective assistance of counsel. Petitioner claims that (1) trial counsel failed to adequately prepare for trial, (2) trial counsel failed to object to an allegedly erroneous intoxication instruction, and (3) trial counsel failed to object to an allegedly erroneous malice instruction. The standard of review is the same: habeas relief is appropriate only where the adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Supreme Court law. *See* 28 U.S.C. § 2254(d).

The benchmark for judging any claim of ineffectiveness of counsel, as governed by the Supreme Court's decision in *Strickland v. Washington,* is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having pro-

duced a just result." *See* 466 U.S. 668, 686, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *see also Commonwealth v. Saferian*, 366 Mass. 89, 96, 315 N.E.2d 878 (1974). In order to prevail on such a claim, petitioner must show (1) that counsel's performance was so objectively deficient, with errors so serious, that counsel was not functioning as "counsel" guaranteed by the Sixth Amendment, and (2) that counsel's deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *See Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. Petitioner must make both showings.

*Strickland* requires judicial scrutiny of counsel's performance to be highly deferential. *See* 466 U.S. at 689, 104 S.Ct. 2052. "It is all too tempting for a defendant to second-guess counsel's assistance after conviction ... and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable ... Every effort must be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, *the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.* *See id.* (emphasis added).

### 1. Failure to Adequately Prepare for Trial

■ Petitioner argues that his counsel was not adequately prepared for trial. In support of this argument, petitioner claims that trial counsel failed to interview certain witnesses and notes that the trial judge denied his motion for continuance at the time of trial. The SJC touched on this claim when it ruled there was no error with the trial court's decision not to contin-

ue the case. *See Habarek*, 402 Mass. at 108, 520 N.E.2d 1303. The SJC reasoned that the trial judge's decision was supported by his findings that the defendant had waited for trial for well over one year, and that it was a simple case to prepare. *See id.* The SJC reasoned that the record did not support the claim that the denial of the continuance prejudiced the case. *See id.* The single justice, furthermore, in his February 26, 1998 decision, determined this claim to be neither new nor substantial. In any case, the alleged error was not so objectively deficient, with errors so serious, that counsel was not functioning as "counsel" guaranteed by the Sixth Amendment, or so deficient as to prejudice the defense and deprive the defendant of a fair trial. *See Strickland*, 466 U.S. at 687, 104 S.Ct. 2052.

### 2. Failure to Object to Intoxication Instructions

Petitioner claims that counsel's failure to object to certain intoxication instructions and pursue the matter on appeal constitutes ineffective assistance of counsel. The single justice reasonably denied petitioner's claim that his counsel was ineffective. The single justice recited, "a failure to object to intoxication instructions ... does not satisfy the two-prong standard." *See Commonwealth v. Haberek*, Crim. No. 97–0609, Memorandum of Decision at 5 (Mass. February 26, 1998). The single justice noted that it was a "reasonable tactical decision" not to "make any great point of intoxication" and undercut petitioner's other lines of defense. The single justice noted that the defendant offered very little evidence that his intoxication debilitated his mental state, and that "the gravamen of the defense offered at trial was one of misidentification." *See id.*

As discussed above, petitioner also relies on *Commonwealth v. Henson*, 394 Mass. 584, 476 N.E.2d 947 (1985), which held that "where proof of a crime requires proof of a specific criminal intent and there is evidence tending to show that the defendant

was under the influence of alcohol ... the judge should instruct the jury, if requested, that they may consider evidence of the defendant's intoxication ... in deciding whether the Commonwealth has proved that specific intent beyond a reasonable doubt." As discussed above, however, the rule in *Henson* was not applied to "murder" specific intent until after petitioner's trial. *See Commonwealth v. Grey*, 399 Mass. 469, 505 N.E.2d 171 (1987).

This Court concurs with the holdings of the single justice and the trial court. The failure to object to and raise the intoxication instructions on appeal does not satisfy either prong of *Strickland*: counsel's performance was neither (1) so objectively deficient, with errors so serious, that counsel was not functioning as "counsel" guaranteed by the Sixth Amendment, nor (2) so prejudicial to the defense so as to deprive the defendant of a fair trial. *See Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. This Court concurs with the ruling of the single justice that "it was a reasonable tactical decision by counsel" not to object. This ruling is bolstered by the fact that the instructions themselves did not constitute a deprivation of due process: the failure of a trial court to charge on intoxication or its possible effect on criminal intention does not constitute a denial of the Due Process Clause so as to justify habeas corpus relief. *See Montana v. Egelhoff*, 518 U.S. 37, 116 S.Ct. at 2016–23.

### 3. *Failure to Object to Malice Instructions*

Similarly, the failure of counsel to object to the malice instruction at trial "cannot constitute inadequate assistance." *See Commonwealth v. Haberek*, Crim. No. 97–0609, Memorandum of Decision at 7 (Mass. February 26, 1998). The fact that the trial judge instructed the jury on all three prongs of malice was justified by the fact that the petitioner was "charged with murder in the first degree, murder in the second degree, and manslaughter." *See id.* The single justice reasoned that "even

if he had pressed the point [on malice], it would not have made a difference." *See id.* In other words, the failure to object does not constitute inadequate assistance of counsel because the instructions, themselves, were not violative of due process.

The state did not unreasonably apply federal law, as clarified by *Strickland*, to deny petitioner's claims when the trial judge and the single justice reasonably concluded that (1) counsel's performance was not so objectively deficient that counsel was not functioning as "counsel" guaranteed by the Sixth Amendment, and (2) counsel was not deficient so as to prejudice the defense and deprive the defendant of a fair trial. Furthermore, this Court has concluded that said malice instructions "did not render the trial so fundamentally unfair, and so infect the entire trial, that the resulting conviction violated due process ... the inclusion of this instruction is neither contrary to, nor an unreasonable application of, federal law as decided by the Supreme Court." As such, this Court denies petitioner's claims for habeas relief on this issue.

## V. CONCLUSION

For these reasons, the Petition for Writ of Habeas Corpus is denied.

SO ORDERED.